## Johnson Estate

*William H. S. Wells* and *Herbert S. Riband, Jr.,* and *Saul, Ewing, Remick & Saul,* for accountant.

*Harry A. Kalish,* amicus curiae.

*Pace Reich,* for City of Philadelphia.

*James L. Price,* representing the Attorney General, for the Commonwealth of Pennsylvania as parens patriae in charitable trusts.

KLEIN, Adm. J., September 24, 1970.—John G. Johnson, one of the greatest lawyers in the history of the United States, and a resident of Philadelphia, died April 14, 1917. Aside from his professional activities,

his interest was centered principally in the collection of art objects. He assembled one of the most interesting and important private collections of his time, and when he drew his will in 1912 his primary concern was the manner in which it would be preserved and exhibited for public view after his death. He provided for a gift of the collection to the City of Philadelphia, conditioned upon the city arranging for the construction of a proper building to house it. His instructions for the care and exhibition of the collection are set forth in detail in an adjudication bearing the date of December 17, 1958.[1]

The administration of the collection has been fraught with many serious and troubling problems which were considered in the earlier adjudication. At that time, permission was granted to the trustee and the City of Philadelphia to enter into an agreement with the Philadelphia Museum of Art for the continued storage and display of the John G. Johnson Art Collection in the Museum of Art for a period of 10 years from the date of the adjudication. The trustee was directed, further, to submit the arrangement to the court for further study and consideration at the expiration of the 10-year period.

The present account is stated to have been filed for confirmation and for the further consideration of this court as directed in the earlier adjudication.

To assist the court in this matter a decree was entered May 10, 1968, appointing Harry A. Kalish, Esq., amicus curiae and directing him to:

"(1) Examine the Third Account of The First Pennsylvania Banking and Trust Company, Trustee, and make his recommendations to the Court with respect to the confirmation of said account at the audit thereof;

---

[1] EDITOR'S NOTE: See 15 D. & C. 2d 407.

"(2) Arrange for the examination and inventory by competent experts of the paintings, sculpture, books and other objects d'art, comprising the Johnson Art Collection and to report his findings to the Court as to whether the collection is intact and adequately protected and supervised; and

"(3) To make recommendations to the Court for the future custody and exhibition of the Johnson Art Collection."

Mr. Kalish filed a report in which he recited that on July 23, 24 and 25, 1968, he examined the entire Johnson Art Collection with Henri Marceau, the then curator of the collection, Barbara Sweeny, the then associate curator of the collection, John W. Thorn, vice president of The First Pennsylvania Banking and Trust Company, trustee under the will of John G. Johnson, George L. Stout, director of the Isabella Stewart Gardner Museum of Boston, Mass., as an independent art expert, and William H. S. Wells, Esq., attorney for the accountant, all of whom certified to the existence of the paintings and art objects bequeathed by the testator to the City of Philadelphia and located at the art museum. He further concluded and affirmed that the collection is intact, adequately protected and supervised.

Mr. Kalish also made the following recommendations:

"1. . . that the Agreement for the continued storage and display of the John G. Johnson Collection between the Philadelphia Museum of Art, the City of Philadeophia and The First Pennsylvania Banking and Trust Company, dated December 17, 1958, as amended, be continued on substantially the same basis for an additional period of 10 years and that such an agreement be submitted to this Court for its approval no later than 60 days from the date of the confirmation of this Third Account.

150

"2. . . . that this Honorable Court direct The First Pennsylvania Banking and Trust Company, Trustee under the Will of the late John G. Johnson, Deceased, to submit a written report within one year from the date of confirmation of this Third Account with respect to the steps which have been taken to assure that a trained and qualified Curator for the John G. Johnson Collection will be available upon the retirement of the present Curator, Henri Marceau.

"3. . . . that the Curator be authorized to sell the objects (excluding those objects designated by asterisks) set forth on Exhibit 6 hereof and be directed to submit a written report to the Court within one year from the date of confirmation of this Third Account with respect to the revenue derived from such sale so that a determination can be made at that time with respect to the disposition of the proceeds derived from such sale.

"4. . . . that the Third Account of The First Pennsylvania Banking and Trust Company, Trustee, be confirmed at the audit of said Account."

Regrettably, Henri Marceau died on September 15, 1969, subsequent to the filing of Mr. Kalish's report. Mr. Marceau was internationally respected as a scholar in the field of art. His many years of dedicated service in connection with the Johnson Collection was instrumental in bringing the universal acclaim which the collection justly enjoys. Fortunately, his assistant and associate for many years, Barbara Sweeny, has been appointed to succeed him as curator. Her long association and detailed knowledge of the collection fully justifies her appointment.

## RENEWAL OF LEASE

Hearings in this matter were held on June 24, 1969, and March 24, 1970. Witnesses were called by the

accountant to testify as to the manner of exhibiting, storing and protecting the collection since the 1958 adjudication. Mr. Marceau testified on June 24, 1969, and described at some length the physical housing and preservation of the collection, the security measures provided for its protection, the facilities for the storage of items not currently on exhibition and the present policy with respect to the loan of items from the collection.

George L. Stout, a recognized expert in the field of administration of art museums, expressed the opinion that "the safekeeping and the general care and security of the collection are fully up to the highest maximum standards."

Evan H. Turner, Director of the Philadelphia Museum of Art, described the space allocated to the Johnson Collection, which he characterized as the "museum's greatest single jewel." He assured the court that the present space was adequate, that it satisfied both the public and the professional staff and that there were no plans to move the collection from the galleries in which it is now located.

We are satisfied that the Johnson Collection is intact, that it is being housed and exhibited under the most favorable conditions, and that it is being adequately protected and supervised. As a practical matter, there is at this time no other institution or facility in the City of Philadelphia where this collection could be housed as well. As we said in the 1958 adjudication, ". . . it would be unwise . . . to jeopardize the future safety of this valuable art collection, and to deprive the general public of the pleasure of viewing it until the question of its permanent home is finally settled."

For the reasons discussed in detail in that adjudication, we said that we would refrain from considering

the question of the permanent removal of the collection to the art museum or to any other place. The same reasons are as valid today as they were then, and we have, therefore, concluded that the present arrangement should be continued for another period of 10 years. Accordingly, permission is hereby granted to the City of Philadelphia and the trustee to enter into an agreement with the Philadelphia Museum of Art, in the form submitted by Mr. Wells, and approved by Mr. Kalish as amicus curiae.

## PROTECTION OF THE COLLECTION

At the hearing on March 24, 1970, Barbara Sweeny described the present arrangements for the storage of paintings not on exhibition. She said there are 1,279 paintings in the collection, of which 525 were on exhibition and the remainder were in storage. There was some indication that these latter paintings were not being stored under ideal conditions because during the winter months the storage area at times lacks sufficient moisture. We therefore directed that a further study of this problem be made and that the report be submitted to Mr. Kalish for his recommendation.

Mr. Turner and Miss Sweeny conducted such a study and reported that the lack of moisture at certain times could be harmful to the paintings in storage, particularly those on wooden panels. Miss Sweeny consulted with the firm of Robert J. Sigel, Inc., Consulting Engineers, the organization which surveyed and supervised installation of the humidification system in the exhibition galleries in which the Johnson Collection is hung. They recommended the installation of a central type humidification system at a cost of between $1,500 and $2,000, in addition to their fee of approximately $350. Both Miss Sweeny and Mr. Kalish have accepted this proposal and they recommend that it be implemented as soon as possible.

Mr. Turner also suggested that the paintings in the storage area would benefit by dehumidification in the summer months so that there would be a constant level of humidity throughout the year.

In the course of the hearings, there was some discussion as to the protection from theft or vandalism of the items hanging in the storage area. It was brought out that the outside windows along one wall of the area are protected by heavy and handsome iron gratings, so that the possibility of unauthorized entry is remote. However, as Mr. Turner pointed out in a letter to the court dated May 7, 1970, annexed hereto, ". . . in this day and age when objects are so frequently thrown at moments of anger, it would seem . . . wise to cover the glass of these windows so that if any . . . vandalism were to be attempted from outside, the pictures would not be harmed in any way."

We accept and approve these recommendations and direct the trustee to authorize the purchase and installation of a central type humidification system, a suitable dehumidifier, and to arrange to cover the glass of the outside windows of the storage areas as suggested by Mr. Turner. The trustee shall submit a report to the court when the work has been completed.

## SALE OF CERTAIN ITEMS IN THE JOHNSON COLLECTION

Another very important matter that requires our attention is a request that the court permit the sale of certain furniture, rugs, bric-a-brac and other objects left by testator which are now in storage at the Philadelphia Museum of Art. We are here concerned with items which, according to the testimony of Henry Marceau, were never listed in any of the catalogues covering testator's art collection. Following Mr. Johnson's death, no place was available to display them

and they were put in storage until around 1933, when they were finally taken to the art museum and there they have languished in various storage areas to the present time. From the time of testator's death, these items have never been exhibited as works of art.

At Mr. Kalish's request, the curator prepared an inventory and appraisal of these objects, showing a total valuation of $268,218. This compared to an appraisal of the same objects made in 1919, when they were valued at $107,231. An historical note appended to the recent appraisal explains why this question has now become a matter of some urgency:

"Mr. Johnson's house at 510 South Broad Street was not opened as a public museum until November 1923. The Fire Marshal of the City had ruled that only the first two floors could be used for exhibition purposes. This resulted in the display of 275 pictures at the house. Those remaining were stored on the third and fourth floors of the house and in a large suite in the Atlantic Building, Broad Street. In August of 1922, the furniture, miscellaneous objects and rugs had been stored at the Fidelity XXth Century Warehouse, Market Street. In 1931, pictures in the Atlantic Building were sent to the Art Museum for storage and the furniture, objects and rugs were moved from the Fidelity Warehouse and stored on the third and fourth floors of the Johnson house. In 1933 the Johnson house was closed and everything moved to the Art Museum, and while there, furniture, objects and rugs have been moved to six locations as the space they occupied was required for construction of galleries, etc.

"In recent months the Museum has requested that we move to a new storage area to make way for office expansion. The space presently allocated to us is not adequate to store the furniture, objects and rugs properly."

At the hearing on March 24, 1970, John Frederick Smith, head of the European Furniture Department at Parke Bernet Galleries in New York City, testified that, at the request of Mr. Wells, he examined the furniture and bric-a-brac for the purpose of determining their value and whether they would be suitable for sale in the Parke Bernet Galleries. As to the furniture, he found that in the main they were nineteenth century reproductions of eighteenth century or earlier pieces; that they were of good quality and in reasonably good condition; that this type of furniture is not very fashionable at the moment and does not command a strong market; and that in his opinion they would sell equally well and possibly better in Philadelphia than in New York. As he put it, "The furniture which I examined belonging to the Johnson collection would be in New York a very small fish in a very big sea. In Philadelphia it would be a bigger fish in a smaller sea." He also said that he did not regard this furniture as important, i.e., of museum quality.

Mr. Smith further testified that the bric-a-brac, bronzes and similar items were not of sufficient quality to meet the standards of the Philadelphia Museum of Art, although they might be worthy additions to the collections of smaller museums. He recommended that these items, as well as the rugs, be sold at Parke Bernet Galleries, where he believed they would bring better prices than elsewhere.

Nesahan G. Hintlian, a qualified expert in oriental rugs and carpets, was called as a witness at both hearings. He testified that he had examined each rug and arrived at an appraised value according to the condition it was in. He also examined about one-third of the rugs to determine whether they were of museum quality and "found that they were not old enough [or]

good enough to keep in exhibition in a museum." He expressed the opinion that if the rugs were to be sold, they would bring the best prices at Parke Bernet Galleries.

George Leslie Stout was asked to express an opinion as to the quality of the bric-a-brac, bronzes and other miscellaneous items and he replied:

". . . The standard of excellence in workmanship is an indefinite standard. It escapes exact recognition and certainly it eludes verbal definition. The circumstances of the exhibition or installation of a work of art affect the appraisal of the quality of that work of art as to whether or not it is appropriate to be where it is. A few of these objects, I should say, probably not more than 10 or 12, in my opinion, would be appropriate to the Johnson collection and to the general quality of that collection as I have known it and as it has been known wherever works of art are known and are carefully studied. . . I would add one further comment and that is to attempt to exhibit all of these as part of the Johnson collection would degrade the character of that collection and would seem an inappropriate intrusion."

We have carefully reviewed the entire record to arrive at a reasonable and practical solution to the problem presented by the furniture, miscellaneous objects and rugs which are the property of the John G. Johnson Collection. They occupy valuable storage space at the Philadelphia Museum of Art, space which the museum could no doubt put to much better use. There is little or no likelihood that these items, with perhaps a few exceptions, will ever be publicly exhibited as part of the Johnson Collection.

We believe the time has come to dispose of the bulk of these items. We see no useful purpose to be served by continuing to store them at the expense of the trust. Accordingly, the trustee is directed to file with this

court a petition for the public sale of the furniture in Philadelphia and of the bric-a-brac, miscellaneous items and rugs at the Parke Bernet Galleries in New York. The petition should identify those items which are to be excluded from the sale and should include the joinder of the amicus curiae and the City of Philadelphia.

## LOAN POLICY OF THE JOHNSON COLLECTION

Finally, we have been concerned for some time about a policy to control the loan of paintings in the Johnson Collection to exhibitions and to other museums. We asked the trustee to assist us with the development of a policy that would fully protect the collection and yet be fair to other communities interested in the loan of paintings.

At the hearing on June 24, 1969, Mr. Marceau testified in general terms as to the present policy on loans. We then asked Miss Sweeny to prepare a statement of policy with respect to loans which she has done in the following language:

"It is recognized that the paintings in the Johnson Collection are owned by the City of Philadelphia and hence are public property, although under the terms of Mr. Johnson's Will, the care, preservation, and maintenance of the paintings is placed in the Trustee under his Will. The curator of the Collection is appointed by the Trustee and the Trustee, in turn, is under the jurisdiction of the Orphans' Court Division of the Court of Common Pleas of Philadelphia County.

"Although, as a general rule, it would not be deemed appropriate to make loans of the paintings from the Johnson Collection, there are certain exhibitions of importance, both in this country and internationally, which are of such a character that the presence of a Johnson painting at such an exhibition will add to the

reputation and distinction not only of the painting but also the Collection as a whole.

"With this general policy in mind it is proposed, subject to the approval of the Court, that the following policy be adopted with respect to loans of paintings in the Johnson Collection:

"1. No paintings on wooden panels are to be loaned, except:

"a. where it is desirable to send the painting elsewhere to establish its authenticity or for restoration and preservation, and

"b. where the curator is satisfied that the paintings can safely travel.

"2. The curator may from time to time place certain paintings on or remove them from a restricted list, and while on such list, a painting shall not be loaned.

"3. Loans will be made only to other museums where security is equivalent to that afforded the paintings at the Philadelphia Museum of Art and where such a loan would enhance the reputation of the painting and the Collection.

"4. No loan of any painting shall be made for a period of more than six months—wall to wall.

"5. Insurance and moving costs in connection with the loan of any painting shall be paid by the borrower according to a written agreement. The curator shall determine the manner of shipment, including a possible personal escort and the amount of insurance to be carried by the borrower.

"6. Any painting which is loaned must labeled and catalogued as LENT BY THE JOHN G. JOHNSON COLLECTION, PHILADELPHIA.

"7. Any exception or revision of the policy with respect to loans shall be made only on the recommendation of the curator and with the consent and approval of the Trustee of the Estate of John G. Johnson and

of Orphans' Court Division of the Court of Common Pleas of Philadelphia County."

Mr. Kalish has recommended that the policy be approved by this court in the form submitted and we will adopt his recommendation. Our primary interest has always been to safeguard the priceless treasures that comprise this unique collection. We recognize, however, that no one can guarantee with certainty that no harm will come to them, whether they remain in the Philadelphia Museum of Art or are loaned to other museums with adequate security measures. There are risks involved in any policy determination. The policy proposed by the curator of the collection is sound and provides workable, professional criteria which will resolve most questions that may arise in this area in the future. Accordingly, the policy as stated is hereby approved and the trustee is authorized to make such loans of paintings as are sanctioned thereby.

Saul, Ewing, Remick & Saul, counsel for the trustee, have requested a fee of $10,000 for their services, and Mr. Kalish has requested an allowance of $7,706.48, which includes $206.48 out-of-pocket expenses, for his services as amicus curiae. We are of the opinion that the services performed by counsel and by the amicus curiae fully justify the fees requested and they will be so allowed.

All parties in interest are stated to have received notice of this audit. Proof of compliance with Rule 5, Sec. 5, of the Sup. Ct. O. C. Rules relating to notice to the Attorney General of the Commonwealth of Pennsylvania in cases involving charitable gifts, is annexed. . .

And now, September 24, 1970, the account is confirmed nisi.